SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

CHILDREN'S HOSPITAL, James D. Jennings, Ernest G. Ross, Defendants.

Civ. A. No. 4477 Phx.

United States District Court
D. Arizona.

Jan. 14, 1963.

Arthur E. Pennekamp, Regional Administrator, F. E. Kennamer, Jr., Asst. General Counsel, Arthur H. Hutton, San Francisco, Cal., Martin V. Miller, Asst. Chief Enforcement Attorney, Arthur F. Mathews, Washington, D. C., Attorneys for Securities and Exchange Commission, for plaintiff.

No appearance for defendants.

Davis, District Judge

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I

### Background Statement

#### A. *Pleadings*

1. On November 2, 1962, the Securities and Exchange Commission ("Commission") filed a complaint to enjoin Children's Hospital ("Children's"), James D. Jennings ("Jennings") and Ernest G. Ross ("Ross") from engaging in acts and practices constituting violations of Section 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a) and (c) (first count) and Section 17(a) of the Act, 15 U.S.C. § 77q(a) (second count).

2. The first count alleges that the defendants have been offering and selling the 8% first mortgage bonds of Children's Hospital without a registration statement as to such securities having been filed or in effect with the Commission. The second count alleges that the defendants have been offering and selling the bonds by means of various untrue, deceptive and misleading statements of material facts. Each count is cast in the statutory language, and includes suitable allegations that the defendants have been using the mails and means and instruments of interstate commerce in offering and selling the bonds.

#### B. *Preliminary Proceedings*

1. A temporary restraining order was entered on November 2, 1962, and has been continued in effect since that time with the consent of the defendants. On November 2, 1962, prior to the entry of the temporary restraining order, affidavits of Arthur H. Hutton, an attorney for the Commission, Helen L. Miles and Ida V. Piccotti, purchasers of Children's bonds, together with attached exhibits, were filed with the Court. A supplemental affidavit of Arthur H. Hutton was filed on December 21, 1962.

2. The defendants have not answered the complaint and are in default. On the basis of the affidavits before the Court and the Commission's complaint, the Court enters the following findings of fact and conclusions of law.

### II

### The Defendants

#### A. *Children's Hospital*

Children's Hospital, an osteopathic hospital exclusively for children, was organized as an Arizona corporation in 1961. It was officially opened on July 8, 1962, and is currently in operation. It occupies a newly constructed building at 6025 North 20th Avenue, Phoenix, Arizona.

#### B. *James D. Jennings*

James D. Jennings was a promoter of Children's and is now both its president

and a member of its board of directors.

C. *Ernest G. Ross*

Ernest G. Ross was a promoter of Children's and is now both its secretary-treasurer and a member of its board of directors.

## III

### The 8% First Mortgage Bonds

A. *Introduction*

1. Until temporarily restrained by the Court, Children's, Jennings and Ross had been offering and selling the 8% first mortgage bonds of Children's to residents of several states. They were responsible for advertisements in newspapers with interstate circulations. Additionally, the mails and other facilities of interstate commerce have been used, at the instance of the defendants, in offering and selling the securities.

2. The total face amount of the 8% first mortgage bonds being offered was $1,650,000. During the period from July, 1961, to November, 1962, Children's, Jennings and Ross sold approximately $1,357,900 of such bonds, in units of $100 denominations and multiples thereof, to numerous investors residing in Arizona, Michigan, Illinois, Ohio and other states.

B. *Nature and Purpose*

1. The defendants have been offering for sale and selling the 8% first mortgage bonds to finance the promotion, organization, construction and initial operation of Children's.

2. The bonds mature serially from date of issue to 20 years and bear 8% interest payable annually.

3. No registration statement covering the bonds has been filed with the Commission under the Securities Act. The defendants apparently claim that the bonds are exempt from registration by virtue of Section 3(a) (4) of the Act, 15 U.S.C. § 77c(a) (4).

C. *Promotion and Sale*

1. The offering brochures and other literature and bond certificates have been mailed by the defendants from Arizona to investors and potential investors residing in Arizona, Michigan, Illinois, Ohio and other states.

2. One of the techniques used to stimulate sales of the bonds has been a letter, sent by Jennings to prospective purchasers, setting forth the amount of bonds already sold and the amount of sales needed to complete the enterprise. The letter contains an offer of up to 5% "free" interest on all bonds purchased in advance of a fixed date.

## IV

### History of the Promoters

A. *Jennings*

1. Jennings' business is the development of hospitals. Since 1955 he has developed two proprietary hospitals in California. In neither instance were funds raised through the sale of bonds.

2. Jennings developed and built a hospital in Scottsdale, Arizona, known as City Hospital Scottsdale, Inc., a $1,500,000 medical facility which was recently completed. That hospital was financed through the sale of 8% first mortgage bonds similar to those being offered and sold by Children's.

3. Jennings also organized a Hawaiian corporation to build Windward Community Hospital of Hawaii ("Windward"), but, according to Jennings, that promotion failed because of adverse publicity. Windward was to be financed through the sale of first mortgage bonds.

B. *Ross*

In early 1961, Ross was president of Windward but withdrew from the promotion at the same time that Jennings did.

## V

### Promoters' Role in Development of Children's

A. *Organization and Solicitation*

1. Jennings, assisted by Ross, has actively participated in the organization of Children's. Jennings and Ross caused Children's to be incorporated, and selected the members of its first board of directors. Thereafter they became the only salaried directors.

2. Jennings and Ross had planned to withhold 10% of the proceeds from the sale of the Children's bonds. That por-

tion of the 10% so withheld and not expended on office overhead, promotion and cost of sales, was to be retained by Jennings and Ross as compensation for their services. Under this arrangement Jennings and Ross were to receive a profit of about $50,000.

### B. Construction of Children's

1. Jennings and Ross selected as prime contractor, Am-Kep Construction Company ("Am-Kep") to construct the hospital facility *without seeking competitive bids.* On July 31, 1961, Am-Kep signed the contract to construct the hospital facility for the sum of $1,700,-000. Am-Kep was to receive $180,000 as profit on the construction.

2. Some four weeks after Am-Kep signed the contract to construct the hospital facility, it advised Jennings that it was in financial trouble. On August 31, 1961, Am-Kep, at the request of Jennings, assigned the contract to construct the hospital facility to Summit Construction Company ("Summit").

3. Jennings, in his official capacity as president of Children's, signed and approved the release of Am-Kep from its obligation. Summit had been formed at this time by Jennings for the *sole purpose* of taking over the contract for the construction of the hospital facility. Jennings and Ross selected the original officers of Summit. Later, Jennings and Ross themselves replaced two of these officers. It was then arranged that the resulting profit of $180,000 on the $1,700,-000 contract would go to two of the three officers of Summit, namely, Jennings and Ross. This was to be in lieu of the estimated $50,000 that Jennings and Ross were to have received for their efforts in selling the securities of Children's.

### C. Operation

1. On July 8, 1962, Children's was opened to receive patients. From that date to the present, Jennings and Ross have held two of the three positions on the board of directors of Children's and each of them has drawn a salary of $1,-000 per month.

2. Jennings and Ross control Children's. They constitute a majority of Children's three-member board of directors. The third officer and board member is not salaried and has not been notified of nor does he attend meetings. This situation has existed at least since January 1962, despite the fact that numerous directors' meetings have been held since that time.

## VI

### Violation of Section 5(a) and (c) of Securities Act

#### A. Nature of Violation

1. Section 5(a) of the Securities Act provides that:

"Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instrumentalities of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

2. Section 5(c) of the Securities Act provides that:

"It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *."

3. The defendants have violated Section 5(a) and (c) of the Securities Act by offering and selling *unregistered* 8% first mortgage bonds of Children's through the mails and through other

means and instruments of transportation and communication in interstate commerce.

### B. *Lack of Defense*

**1.** The defendants have not filed an answer to plaintiff's complaint. Therefore, they have raised no defenses to the allegations contained therein. The Commission has moved for and is entitled to judgment by default. The Court, however, believes that the situation before it warrants setting forth at some length the findings and conclusions underlying the decree to be entered.

■ **2.** Exemptions from the registration requirements of the Securities Act are construed against the claimant of such an exemption. The burden of proof is on the person who would assert such an exemption. (S. E. C. v. Ralston Purina Company (1953), 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494; S. E. C. v. Sunbeam Gold Mines Co. (9th Cir., 1938), 95 F.2d 699.) The proof before the Court shows that the securities offered and sold by the defendants do not fall within the standards of any exempting section. Defendants have not met the burden of proof required to establish an exemption from registration.

### C. *Inapplicability of Section 3(a) (4) · Exemption from Registration for the Children's Bond Offering*

■ **1.** The Section 3(a) (4) exemption is *not* available for an offering of securities when, in essence, the issuing institution is either organized or operated for what is substantially a noncharitable purpose.

**2.** The 8% first mortgage bonds of Children's should be registered in order to afford the protection of the registration provisions under the Act to potential investors in such securities. They are not securities of the nature to which the exemption from registration under Section 3(a) (4) was intended to

apply. That section exempts from the registration requirements:

"Any security issued by a person *organized* and *operated exclusively* for religious, educational, benevolent, *fraternal, charitable,* or reformatory *purposes* and *not* for pecuniary profit, and no part of the net earnings of which inures to the benefit of any person, private stockholder, or individual." [Emphasis added.]

### a. *Interpretations Given by the Courts and Regulatory Bodies to Key Words Appearing in Section 3(a) (4)*

### 1. *"Exclusively"*

Section 3(a) (4) requires that the issuer be organized and operated *"exclusively"* for *inter alia* charitable purposes.

"Exclusively" has been defined at least twice by the Supreme Court. In 1924, the Supreme Court held that a charitable corporation could engage in income-producing activity and still be a corporation operated "exclusively" for charitable purposes as long as the income-producing activities were purely incidental to the principal charitable purposes to which the income was devoted.[1]

Twenty-one years later, in Better Business Bureau of Washington, D. C. v. United States[2], the Supreme Court tightened up the definition of the word "exclusively". That case involved Section 811(b) (8) of the Social Security Act, which contains language identical to Section 3(a) (4) of the Securities Act. The Court, in holding the Better Business Bureau *not* exempt from the provisions of the Social Security Act, applied this test:

" * * * [I]n order to fall within the claimed exemption, an organization must be devoted to educational purposes *exclusively*. This plainly means that *the presence of a single noneducational purpose, if substantial in nature*, will destroy

**1.** Trinidad v. Sagrada Orden de Predicadores (1924), 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458.

**2.** Better Business Bureau of Washington, D. C. v. United States (1945), 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67.

the exemption regardless of the number or importance of truly educational purposes." [Emphasis added.]

Similarly, the Missouri Supreme Court, in interpreting Missouri's Unemployment Compensation Act, which contained identical statutory language as Section 3(a) (4), ruled that "exclusively" means:

"* * * primary and inherent use as over against a mere secondary and incidental use. * * * A substantial non-charitable purpose * * * should be fatal." [3]

■ Based upon the holdings in the Better Business Bureau and Northeast Osteopathic Hospital cases, if, in addition to the charitable purpose of the issuer, there is a substantial non-charitable purpose being served in connection with either the organization or the operation of the issuer of the securities, then the Section 3(a) (4) exemption from registration under the Securities Act is not available for the securities offerings of such issuer.

■ Accordingly, the Section 3(a) (4) exemption is not available for the Children's Hospital bond offering because a "substantial purpose" of the organization of the hospital is to enrich the promoters by providing them with large profits from the enterprise.

### 2. "Organized"

The I.R.S. regulations provide that the determination of whether or not a corporation is "organized" as a charitable corporation shall be made from the language of the corporate charter and by-laws.[4]

However, the courts have given it a much broader meaning by interpreting the word "organized" to mean "created to perform" or "established to promote", rather than restricting it to mean "incorporated" for charitable activities under powers solely available through its charter. The Friedland case [5] illustrates the court's refusal to allow form to control over substance, and clearly supports the assertion that the meaning of the word "organized" is primarily a question of fact to be determined not merely by an examination of the charter and by-laws but rather by determining the reasons for the organization, from sources in addition to the charter and by-laws and by examining the subsequent conduct of the corporation.

In attempting to distinguish the actual substance and intent of the organization from its mere form, the corporate charter and by-laws are simply evidence of the organizer's purposes, which may be supported or rebutted by extraneous evidence.[6] The true purpose of the corporation's organization can be shown by evidence *aliunde* the charter.[7]

■ Thus, the corporate charter and by-laws are not the sole determinants as to whether or not a corporation is "organized" for charitable purposes. In construing a Securities Act exemption the Court is not restricted to the formal corporate purposes set out in the corporate charter and by-laws, but rather can determine the true corporate objectives from all available facts.

### 3. "Charitable * * * Purposes"

■ It appears that a "charitable purpose" requires dedication to a general public purpose for the benefit of an indefinite number of persons who are not required to give adequate consideration for benefits received. However, a hospital corporation is not required to furnish free services to the indigent as a condition precedent to a "charitable" exemption, as long as the hospital is devoted to the care of the sick and in-

3. Northeast Osteopathic Hospital v. Keitel (Mo.1946), 355 Mo. 740, 197 S.W.2d 970.

4. Treas.Reg. § 1.501(e) (3)-1(b).

5. Samuel Friedland Foundation v. United States (N.J.Dist.1956), 144 F.Supp. 74.

6. Faulkner v. Comm'r (C.C.A.1st 1940), 112 F.2d 987; Roche's Beach, Inc. v. Comm. (C.C.A.2d 1938), 96 F.2d 776.

7. Campbell v. Big Spring Cowboy Reunion (5th Cir., 1954), 210 F.2d 1943, 42 A.L.R. 2d 1015.

jured, to aiding in maintaining public health, and to making valuable contributions to the advancement of medical science. A hospital not conducted for the profit of any one connected therewith can be a "charitable" institution irrespective of whether patients are required to pay for services rendered.[8]

Many state court cases, such as the following Illinois decision, contain explanations of the phrase "charitable purpose":

"* * * The principal and distinctive features of a *charitable* organization are that it has no capital and no provisions for making dividends or profits, but derives its funds mainly from public and private charity and holds them in trust for the objects and purposes expressed in the instrument or charter creating the organization. * * * [A]ll funds received by the hospital are devoted to its *charitable* purpose and no part of the money received by it is permitted to inure to the benefit of any private individual engaged in managing the charity."[9] [Emphasis added.]

Following is a comment on "charitable purpose" by an Arizona court:

"If the purpose * * * is * * * *charitable*, * * * and if it is not maintained for the private gain, profit, or advantage of its *organizers*, officers, or owners, *directly or indirectly*, we think the institution is * * * charitable * * * so long as its receipts are devoted to the necessary maintenance of the institution and the carrying out of the purpose for which it was organized. * * * [T]he test is * * * whether those charged with its operation were conducting it for

their private profit or advantage. * * * *"[10] [Emphasis added.]

The charitable purpose must extend to both the organization of the hospital and to its operation. A person who purchases securities in a corporation that is being organized for charitable purposes has the right to expect that the character of the corporation and hence of the securities will remain the same. Indeed, if it be known that the character of a corporation and its securities will change from non-commercial to commercial, such securities should be registered immediately, for not only will the character of the corporation and its securities change from charitable to commerical, but the basic motive impelling the purchasers to invest in the securities will rest upon entirely different considerations. Investors in hospital or other institutions not organized and maintained for strictly charitable purposes are entitled to the disclosures concerning the enterprise which must be made under the registration process.

### 4. *"Not for Pecuniary Profit"*

The "profit" mentioned in this phrase need not emanate from the operational net earnings of the hospital corporation after it commences to provide medical services to the public. Profit from net earnings is discussed in a subsequent clause of Section 3(a) (4), *to wit*: "* * * no part of the net earnings of which inures to the benefit of any person, private stockholder, or individual." In order to prevent this latter clause from constituting mere surplusage, the prior proscription that the organization be "not for pecuniary profit" must be given a liberal interpretation, and must be construed to encompass profit, not only from net earnings, but from any source, arrangement or manip-

8. People ex rel. Doctors' Hospital v. Sexton (1944), 267 App.Div. 736, 48 N.Y.S. 2d 201 (1944) 295 N.Y. 553, 64 N.E.2d 273 (1945).

9. People ex rel. Cannon v. Southern Illinois Hospital Corp. (1949), 404 Ill. 66, 88 N.E.2d 20.

10. Southern Methodist Hospital and Sanatorium of Tucson v. Wilson (Ariz.1938), 51 Ariz. 424, 77 P.2d 458, 459.

ulation, whether such profit inures to anyone directly or indirectly connected with the corporation. Thus, the phrase should be construed to include profits arising from the promotion of the enterprise.

Measured by the foregoing standards, the securities of Children's Hospital are not entitled to exemption from registration under Section 3(a) (4) of the Securities Act. The non-charitable element which defeats the exemption is the promoters' anticipated profit from the organization and promotion of the institution and from the construction of the hospital facilities. Cf. S. E. C. v. United Prosperity Plans, Inc., 1 S.E.C. Jud., Dec. 435 (D.Utah 1937); S. E. C. v. Universal Service Association, 106 F.2d 232 (7th Cir., 1939), cert. denied 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519.

In Bennet v. American-Canadian Ambulance Corp., Inc., [11] the New York Court revoked a corporation's certificate of incorporation as a non-profit corporation because promoters were receiving 10% of contributed funds as commissions. The Court said:

> "The scheme is a shabby subterfuge to enable its creators to realize profits, through the medium of a membership corporation * * * required to be of a non-profit making character."

In Commissioner of Internal Revenue v. Orton [12], the Court of Appeals for the Sixth Circuit, in construing a tax exemption applicable to corporations "organized and operated exclusively for * * * scientific, * * * or educational purposes * * *" quoted and followed the ruling of the Supreme Court in Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458:

> "Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain. * * *"

Section 3(a) (4) of the Securities Act is intended to facilitate the raising of funds by eleemosynary issuers. The section is not intended to allow promoters or managers of any institution to bring offerings of securities to the public, without registration, in order to realize profits for themselves.

### VII

#### Violation of Section 17(a) of Securities Act

A. *Nature of Violation*

1. Section 17(a) of the Securities Act provides that:

> "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
>
> "(1) to employ any device, scheme, or artifice to defraud, or
>
> "(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

2. The defendants in offering and selling the 8% first mortgage bonds of Children's Hospital through advertisements, brochures and sales letters which contain untrue, deceptive and misleading statements of material facts and which omit facts of material significance to investors, as specified in the second count of the complaint, have engaged in a course of business in violation of Section 17(a) of the Securities Act.

3. For example, the brochures, while setting forth the cost of Children's Hos-

11. 178 Misc. 21, 37 N.Y.S.2d 470 (1942).

12. 173 F.2d 483 (6th Cir. 1949).

pital do not disclose the profits to be received by the promoters nor that the construction contract was let without competitive bidding and thereafter assigned to a construction company controlled by the promoters. The brochures do not disclose that the definitive bond certificates include provisions insulating the promoters, directors, trustees and officers of the institution from liability for the enforcement of any right or claim under the bonds. The format and contents of the brochures are intended to suggest to investors that the bonds are safe and attractive from an investment standpoint, offering elements of high yield and liquidity. The brochures, however, do not disclose to investors that servicing of the bonds will require an invasion of capital funds of the institution, that bondholders would be in a precarious position if sufficient bonds were not sold to cover the cost of construction of the hospital and needed equipment, and that under an I.R.S. ruling the status of the hospital as tax exempt cannot be determined until the facility has been in operation for at least one year.

4. The brochures are also deceptive and misleading in describing the need for hospitals for children in Arizona and stating that Children's would be staffed by "pediatric specialists" and "general practitioners", while not disclosing the osteopathic as opposed to general nature of the facility, and that the development of the hospital does not conform to a plan for the orderly development of hospitals approved by the Arizona State Board of Health and other hospital administrators.

5. These deceptive and misleading statements run throughout the brochures and infuse the entire offering with elements of deceit, in contravention of Section 17(a) of the Securities Act.

### VIII

#### Jurisdictional Evidence

The defendants have made extensive use of the mails and means and instruments of interstate commerce in offering and selling the 8% first mortgage bonds of Children's Hospital under the circumstances set forth in these findings. The defendants also have used the mails and means and instruments of interstate commerce in delivering the securities to investors.

### IX

#### Conclusions

The Court finds and concludes that the defendants have violated Sections 5(a) and (c) of the Securities Act, in offering and selling the 8% first mortgage bonds of Children's Hospital without a registration statement as to such securities having been filed with the Securities and Exchange Commission. The Court also finds and concludes that the defendants have violated Section 17(a) of the Securities Act in offering and selling the securities in a deceptive and misleading manner.

Accordingly, the Commission is entitled to a decree of permanent injunction as demanded in its complaint.