**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**The SENEX CORPORATION et al., Defendants.**

**Civ. No. 74–53.**

United States District Court, E. D. Kentucky, Covington Division.

March 3, 1975.

David P. Doherty, Asst. Director, Harris S. Ammerman, Washington, D. C., James E. Birchby, Denver, Colo., A. Barry Morewitz, Adele R. Geffen, Washington, D. C., for plaintiff.

Morris Weintraub, Newport, Ky., for defendants Senex Corp., Tarley, Alison, Jay, Malcolm & Co. and BFT, Inc.

Charles G. Atkins, Cincinnati, Ohio, Donald L. Johnson, Newport, Ky., for defendants A. J. Jolly and Mentor Corp.

James S. Cox, Memphis, Tenn., for defendant Thomas N. Street, Jr.

### MEMORANDUM

SWINFORD, District Judge*:

This enforcement action commenced by the Securities and Exchange Commission alleges violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5, growing from the offer and sale of $4,425,000 in City of Covington Health Care Revenue Bonds. The complaint seeks preliminary and permanent injunctions restraining the defendants and their agents from engaging in prohibited conduct in connection with this or other securities. On November 5, 1974, a consent judgment of permanent injunction was entered against defendants, Senex Corporation; Arthur Jay Tarley; Alison, Jay, Malcolm & Co. (formerly Stemac Management Corporation); and BFT, Inc. A hearing addressing the propriety of a preliminary injunction against the remaining defendants, A. J. Jolly, Mentor Corporation, and Thomas N. Street, Jr., was conducted over an extended period of time. The parties have filed written arguments and the record is before the court for decision.

### I

Although involving numerous interlocking transactions and parties, the cir-

---

* This case was heard before, and the opinion prepared by, the Honorable Mac Swinford. The opinion was found by the Clerk after Judge Swinford's death and, at the direction of the Honorable H. David Hermansdorfer, Judge of the U. S. District Court, Eastern District of Kentucky, was placed in a sealed envelope. By consent of the parties, the sealed decision was accepted as binding, after which the sealed envelope was opened and the opinion filed by Judge Hermansdorfer.

cumstances surrounding the Covington bond offering are largely uncontested. The testimony indicated that in January, 1971, A. J. Jolly and Arthur Jay Tarley formed the Senex Corporation to develop health care programs and facilities for the elderly and infirm. Beginning with his term as Campbell County Judge, Jolly had investigated and formulated various plans and projects designed to maximize the infusion of federal aid into municipal centers for health care. Through repeated exposure to and utilization of government regulations, Jolly developed "tri-level" projects in several Kentucky counties erected to provide continuing skilled nursing, intermediate care and personal care beds. The formation of Senex was intended to couple Jolly's knowledge of program formulation in this area with Tarley's expertise in the construction field.

In March, 1971, Jolly was contacted by Covington Mayor Claude Hensley regarding the development of a municipal nursing home. The city was informed that the project could proceed along alternate routes: (1) Senex could act as a consultant for a fixed fee and all risks would be assumed by the municipality; (2) Senex could assume the role of developer of a "turnkey" project [1] for a stated figure; its profits would depend upon the cost of the project, but the city would be relieved of any loss in the event the plan was aborted. The mayor opted for the second alternative, whereupon Jolly suggested the formation of a nonprofit company to operate the facility; the corporation and municipality should then draft a letter and resolution of intent reflecting a willingness to proceed in the event of the project's feasibility. The Covington Health Care Corporation (hereinafter: Health Care Corporation) was thereafter formed by Jolly and appropriate expressions of intent followed.

On October 13, 1971, the Health Care Corporation entered into a contract providing that Senex would construct the facility at a cost of $2,815,000 (later amended to $2,960,000); nearly a year later, Boggs Construction Corporation contracted with Senex to build the structure for approximately $2,312,000. This August 17, 1972, agreement provided that Boggs would assume all the obligations of the Senex contract with the Health Care Corporation. Jolly's involvement with the contracting parties was somewhat remote since he had divested himself of Senex stock during the summer of 1971; however, a concomitant agreement recited that Jolly would be retained as consultant to Senex and share equally in the profits generated by the Covington project. Jolly's activities on behalf of the plan were unaffected by his formation of the Mentor Corporation in October, 1971. Indeed, the mayor was assured of Jolly's continuing participation as the "social architect" of the project.

Difficulties surrounding the Covington nursing home planning were apparently ignited by the publication of an adverse feasibility report by the A. T. Kearney and Company, Inc. (hereinafter: Kearney), which had been commissioned by the Rosedale Manor, a nursing home in Kenton County, Kentucky. Although the parties disagree concerning its scope and bias, the Kearney report generally concluded that the region could not support another facility. Meeting with the Northern Kentucky Health and Welfare Planning Council (hereinafter: Planning Council) on December 9, 1971, Jolly recognized the necessity for properly based feasibility studies; accordingly, Senex on December 17, 1972, contracted with the nationally recognized Arthur D. Little, Inc. (hereinafter: Little) for the preparation of a study forecasting the need for a nursing home complex. A report tendered in January, 1972, paralleled the conclusions reached by the Kearney study and Little's services were termi-

---

1. In a "turnkey" project, the developer assumes all risks incident to the creation of a fully completed facility.

nated shortly thereafter. Concerned about the impact of the Kearney and Little reports, the Covington mayor on January 18, 1972, asked that the Planning Council study the problem and issue recommendations. The inquiry was hampered, however, by difficulties in securing copies of the Little report: Although Jolly had previously indicated to the Council that the study would be supplied, efforts to secure a copy culminated in a March 22, 1972, letter from Tarley indicating that the survey was the property of the bond underwriter (which had not at that time been appointed), and disbursement would be inconsistent with the aims of the project. Although disputed at the hearing, some evidence indicated that copies of the report had been furnished to the Planning Council chairperson and the mayor, and that the inability to secure the report was only indirectly attributable to Jolly.

Efforts to obtain a satisfactory feasibility study were furthered in a March 17, 1972, contract engaging Block, McGibony and Associates, Inc. (hereinafter: Block McGibony), another well recognized firm, to undertake a Northern Kentucky study. On May 31, 1972, Block McGibony rendered its final report concluding that the project was feasible. Additional suggestion of the project's desirability was offered in a "Consultant's Report" by the Mentor Corporation, an enterprise formed by Jolly during 1971. Although the date of the initial report is uncertain, Jolly's testimony that a peripheral task in all municipal contracts was the preparation of a "need survey" indicates that the preliminary Mentor conclusions were revealed soon after the inception of the project. Each of the various compilations of the Mentor study concluded that the construction was meritorious. Refuting the Kearney report, the March 3, 1972, Mentor survey stated:

"(T)HE FACT THAT THE PROPOSAL HAS BEEN REVIEWED BY A SOPHISTICATED INVESTMENT BANKER WITH THE RESULT THAT IT IS WILLING AND ANXIOUS TO INVEST A SUM IN EXCESS OF $4,000,000 WITH NO SECURITY OTHER THAN THE PROJECT ITSELF, IS THE BEST POSSIBLE PROOF OF ITS FEASIBILITY."

The undisputed inaccuracy of the quoted statement is rebutted by Jolly's explanation that the assertion represented his contemporaneous understanding that financing had been located. Although directed to the Senex Corporation, the Mentor Report contained a lengthy examination of the area need for the proposed center, suggested operating guidelines, and a summary of the various governmental aid programs available to the aged; further, the report was incorporated—with Jolly's permission—into the bond prospectus used in acquainting city officials and investors with the issue.

On May 1, 1972, the Health Care Corporation hired Stemac as fiscal advisor at a fee of 3% of the face amount of the bond issue. Representing the firm as a recognized expert in the field of municipal finance, Tarley did not disclose that he had purchased the inactive broker-dealer several months earlier for $1,000. Unsuccessful attempts to locate a bond underwriter for the project resulted in Stemac's appointment in that capacity as well—again without disclosure of Tarley's ownership—in a contract providing for purchase of the entire issue by the underwriter at a discount with payment to be made on August 30, 1972.

Stemac's principal agent was Thomas N. Street, Jr., a former employee of A. S. Hart & Co., a municipal bond house in Memphis, Tennessee. Street was primarily responsible for preparing a prospectus, a task which he had undertaken several times in the past. It is undisputed that the prospectus incorporated no reference to the $648,000 "spread", the negative feasibility studies, or the interlocking ties among the corporate entities associated with the promotion. Rather, the booklet referred to the fa-

vorable studies and detailed the anticipated methods of financing and operation.

The prospectus was used not only in searching for an underwriter and securing final acceptance of the project by city officials but also in obtaining a favorable financial rating and selling the bonds themselves. Employing the prospectus and favorable feasibility reports, Street and Tarley approached Standard and Poor's Corporation and Fitch's Investor's Service. On July 13, 1972, Standard and Poor's declined to rate the bond in a letter advising Tarley that "a disclaimer as to financial relationships, if any, among the financial consultant, those that have done the feasibility study, and the prime contractor might be appropriate . . . ." This reticence was not shared by Fitch's, which assigned an "A" rating on August 3, 1972.

Soliciting the sale of the bonds, Street submitted the prospectus and favorable feasibility studies to various dealers. On July 14, 1972, Seaney, Jones and Company agreed to purchase the entire issue at Stemac's purchase price. It is undisputed that the prospectus-feasibility report "package" was employed in the sale of the bonds at the consumer level and that neither Seaney, Jones nor the ultimate purchasers were aware of the nondisclosed information. The plaintiff demonstrated that Fitch's, Seaney, Jones, and representative purchasers opined that the withheld information would have played a significant role in their decisions.

## II

The Securities Acts of 1933 and 1934 enacted as a result of misdealings in the financial market during earlier years were intended "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *S. E. C. v. Capital Gains Bureau,* 375 U.S. 180, 186, 84 S. Ct. 275, 280, 11 L.Ed.2d 237 (1963);

*Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L. Ed.2d 741 (1972). As noted by President Roosevelt, the 1933 legislation dictates, "let the seller also beware . . . as it puts the burden of telling the whole truth on the seller." H.R.Report No. 85, 73d Cong., 1st Sess. (1933). The court in *Charles Hughes & Co. v. Securities and Exchange Com'n,* 2d Cir., 139 F.2d 434, 437 (1943), cert. denied 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1943), characterized the legislation as "protect(ing) those who do not know market conditions from the over-reachings of those who do." Thus, Section 17(a) of the Securities Act of 1933, sanctions the employment of manipulative devices in the interstate offer or sale of any security:

"It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U. S.C. 77q(a).

Rule 10b–5 promulgated under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), outlaws in similar language the conduct proscribed in Section 17(a) of the Securities Act, but extends coverage to the purchase as well as the sale of securities. 17 C.F.R. 240.-10b–5.

A flexible application of this remedial legislation embraces a wide variety of

deceptions employed by any person. *Supt. of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *S. E. C. v. Capital Gains Bureau,* supra 375 U.S. at 195, 84 S.Ct. 275; *A. T. Brod & Co. v. Perlow,* 2d Cir., 375 F.2d 393, 397 (1967); *Texas Continental Life Ins. Co. v. Bankers Bond Co.,* W.D.Ky., 187 F.Supp. 14 (1960), reversed on other grounds sub nom. *Texas Continental Life Insurance Company v. Dunne,* 6th Cir., 307 F.2d 242 (1962). The statutes broadly command, " '(t)hou shalt not devise any other cunning devices . . . .' " *Securities and Exchange Com'n v. Texas Gulf Sulphur Co.,* 2d Cir., 401 F.2d 833, 859 (1968), cert. denied 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969), and the courts have not hesitated to proscribe conduct unforeseen at the time the statutes were enacted. See 79 C.J.S.Supp. "Securities Regulation" § 61. Although reliance need not be demonstrated in an enforcement proceeding, the misrepresentation must be "material in the sense that a reasonable investor might have considered them important in making of this decision." *Affiliated Ute Citizens v. United States,* supra 406 U.S. at 153–154, 92 S.Ct. at 1472.

### III

■ Although not the subject of a formal stipulation, it is apparently uncontested that the subject bonds are "securities" within the purview of the legislation, *Securities and Exchange Commission v. Charles A. Morris & Associates, Inc.,* W.D.Tenn., 386 F.Supp. 1327 (1973), and that means or instrumentalities of interstate commerce were employed in connection with the offering. Rather, the primary issues concern the materiality or necessity of disclosing: (1) the $648,000 profit "spread" represented in the contract between Senex and Boggs Construction Company; (2) that the Mentor report was prepared by an individual who would share 50% of the developer's profits; (3) the existence of two adverse feasibility reports;

(4) that the project's financial advisor and the underwriter were owned and controlled by the developer; (5) that an independent underwriter could not be located. Secondary disputes involve the degree and significance of the defendants' involvement in the challenged activities, the existence of an advice of counsel defense, and the availability of injunctive relief.

### IV

The plaintiff argues that the difference between the $2,960,000 construction price represented to the city and the $2,312,000 stated in the contract with Boggs Construction Company was a matter subject to disclosure under the legislation. It is maintained that the unreasonable "spread" between the two amounts diminished the actual value of the project and was a matter of considerable significance to potential bondholders. Thus, *Securities and Exchange Com'n v. Childrens Hospital,* D.Ariz., 214 F.Supp. 883, 891–892 (1963), ruled that nondisclosure of promoter's profits constituted a violation of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a):

> "The defendants in offering and selling the . . . bonds . . . through advertisements, brochures, and sales letters which contain untrue, deceptive and misleading statements of material facts and which omit facts of material significance to investors . . . have engaged in a course of business in violation of Section 17(a) of the Securities Act.

> 3. For example, the brochures, while setting forth the cost of Children's Hospital do not disclose the profits to be received by the promoters . . . ."

■ The court is unable to conclude that the "spread" should have been revealed. It is initially apparent that the reliance on the Children's Hospital opinion ignores several significant distinctions between that case and this. First, the defendants in the cited decision were promoters while Senex acted as a con-

tractor; obviously every subcontract contemplates a profit for both parties, and there is no suggestion that the amounts of all such agreements must be disclosed. Second, the violators in Children's Hospital assigned a construction contract to a controlled firm while Boggs Construction Company as an independent entity is seemingly desirous of a profitable project.

The defendants' argument is further strengthened by the position apparently assumed by the SEC. The absence of a contention that the disclosure requirements apply to all profits enjoyed by every party to a securities transaction indicates that the primary focus of the plaintiff's attack is the excessive nature of the profits represented in the contracts rather than the mere existence of a "spread". An examination of the circumstances underlying the construction of the institution strongly indicates that the profits were not unreasonable or excessive in light of the risks assumed by Senex and the guarantees made the city. The "turnkey" aspect of the project guaranteed to the city and Health Care Corporation at a fixed cost a nursing center available for immediate patient occupancy. Although the security attending the guaranteed cost plan is itself significant, there is every reason to assume that the parties anticipated a substantially diminished profit notwithstanding the superficially excessive "spread". The incomplete nature of architectural and engineering planning at the time of the Senex-Boggs agreement is reflected in the contractual language stipulating that the cost of any additions or alterations would be borne by Senex. Unanticipated amendments and economy fluctuations could—and did— diminish the defendants' profits. The preliminary cost estimates spiraled until the ultimate "spread" amounted to only $130,000; this figure is subject to further contraction by contingent penalties attributable to late completion of the project. Although the court is not desirous of ascertaining an "acceptable" return in the construction field, the evidence clearly demonstrated that the original understanding contemplated a true profit consistent with the particular nature of the Covington project. The possible desirability of publicizing the "spread" does not engender a conclusion that the nondisclosure was improper under the Securities Acts.

## V

A substantial portion of the plaintiff's evidence was devoted to an attack upon the manner of implementing various feasibility reports prepared by Kearney, Little, Mentor, and Block McGibony; it is maintained that the uncertainty cast by the Little and Kearney studies resulted in a series of improprieties designed solely to prevent termination of the project: (1) the Kearney report was condemned as the self-serving product of a competing nursing home and the Little report was suppressed from agencies interested in the project; (2) the services of the A. D. Little Company were discontinued and the Mentor Corporation commissioned to undertake a feasibility study which, in view of its biased posture, could not be expected to realistically portray the need for a new facility; (3) the prospectus hailed the favorable views reflected in the Mentor and Block McGibony studies but omitted the contrary opinions expressed in the Little and Kearney reports.

The defendants argue that the Mentor study was not devoted to an analysis of the financial need for the project; rather, the pursuit represented merely Jolly's efforts on behalf of Senex to determine the propriety of continued planning. Further, the Kearney study was prepared by a competing enterprise and did not properly portray community needs; similarly, the Little report was an incomplete analysis focusing upon the traditional care system while ignoring Jolly's unique "tri-level" project development.

This court is convinced that the defendants should have disclosed the re-

lationship of Mentor and Senex. Whatever the claimed scope of the Mentor report, the study was widely publicized as demonstrating the desirability of the project. The presumed accuracy of the report does not abrogate the obligation to explain that Mentor's profits were dependent upon the success of the project. Although consultants are normally compensated, the constructive bias of Mentor's position was a matter which should have been revealed.

The court attaches little importance to the suppression of unfavorable reports from the Planning Council. The reprehensible nature of such conduct is minimized by proof indicating that these defendants exercised marginal responsibility for the exclusion; further, the agency involved was a nonpublic *ad hoc* committee composed primarily of industry representatives. Of considerable significance, however, was the nondisclosure of the adverse findings to parties interested in the bond issue. Such conduct is clearly at odds with the spirit of the disclosure requirements.

The mass of evidence indicting the Kearney and Little reports as inaccurate and/or inadequate does not excuse the defendants' silence; regardless of the deficiencies, the adverse reports represented a difference of opinion among experts which should have been disclosed. The dispositive issue is not the relative merits of the surveys but the differing conclusions reflected; the informed judgment contemplated by the securities legislation was denied by an ex parte determination on the part of nonobjective controllers that the adverse conclusions were valueless. *Securities and Exchange Com'n v. Texas Gulf Sulphur Co.*, supra; *Securities and Exchange Com'n v. Children's Hospital*, supra at 892; 79 C.J.S.Supp. "Securities Regulation" § 55, p. 232, note 27. Significantly, the admitted shortcomings of the Mentor report were ignored in favor of an expostulation of the positive results flowing from that study. Finally, the vindication of the favorable reports manifest by the current success of the project has no impact upon the nondisclosure in the first instance. See *S.E.C. v. Capital Gains Bureau*, supra, 375 U.S. at 195, 84 S.Ct. 275.

## VI

The financial dependence of the fiscal advisor and underwriter typified other important instances of nondisclosure. The improper conduct surrounding the feasibility reports was compounded during the search for a financial advisor, underwriter, and sympathetic bond rating agency. The hiring of Stemac as fiscal advisor was improper in two respects: First, Tarley's ownership was not disclosed; second, Stemac was falsely characterized as a "recognized expert in the field of municipal finance." Although the court is relatively unimpressed with the plaintiff's contention that difficulties in securing an underwriter must be reported, the continuing omissions attendant to the appointment and functioning of Stemac in that capacity are inconsistent with the philosophy of the disclosure requirements.

The initial effect of the defendants' nondisclosures upon parties closely involved in the project was soon displaced by a more profound impact upon rating agencies, dealers, and consumers. See *Wolfson v. Solomon*, S.D.N.Y., 54 F.R. D. 584, 592 (1972). At no time during the lengthy period involved in the promotion did the defendants make any effort to afford an accurate depiction of the experts' disagreements or the financial entanglement among involved entities. The testimony of affected parties clearly revealed the importance which such disclosure would have commanded in their deliberations.

## VII

This court has little difficulty identifying the defendants' responsibility for the unlawful activities. Although the existence of an evil intent may be doubted, it remains apparent that Jolly and

Street directed, participated in or had intimate knowledge of many of the irregularities attending the Covington bond project. Despite this superior position, no effort was made to correct the improprieties or afford full disclosure.

A. J. Jolly legitimately claimed vast experience in formulating successful municipal nursing home projects. Indeed, this expertise led to his initial contact by the City of Covington. The defendant frequently interacted with interested public agencies, entities involved in the plan itself, and independent feasibility surveyors; incorporated the Health Care Corporation; directed the preparation of letters of intent and signed legal documents pertaining to the project. Recognizing the importance of feasibility studies, Jolly met with the Planning Council to assure that body of the project's desirability. Whatever his role in ultimately suppressing the Arthur D. Little report, the company was directly answerable to Tarley and Jolly. Although acting nominally as a consultant at the time the Mentor report was prepared, Jolly's contract with Senex provided that any remuneration was dependent upon the success of the project. The somewhat reasonable explanation for the reference in the Mentor study to a "sophisticated investment banker" does not dilute the character of the representation as part of a continuing effort to interest city officials in the project. Notwithstanding his biased position, Jolly prepared and permitted use of the Mentor report in the prospectus and as part of a "package" designed to impress securities dealers. Finally, the record leaves scant doubt that the period spent convalescing and managing political campaigns did not diminish Jolly's continuing active participation in the project.

Thomas N. Street, Jr. wrote and was familiar with the representations in the prospectus, the existence of the Little report, and the intimacy among Senex, Mentor, and Stemac; he acted as fiscal agent through Stemac and was largely responsible for securing the bond rating and selling the bonds. Although not a stockholder or officer of the involved companies, Street's compensation was directly related to the success of the program. Notwithstanding his superior expertise in the municipal bond field and experience in preparing prospectuses, Street made no effort to disclose the financial intimacy of involved corporations or the unfavorable feasibility reports.

■ While the court entertains little doubt that the defendants were not motivated by a desire to reap the dividends of a project which they knew was worthless, the proof demonstrated an intent sufficient for an injunction under the Securities Acts:

> "Congress, in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure and actual injury to the client. Congress intended the . . . Act . . . to be construed like other securities legislation 'enacted for the purpose of avoiding frauds,' not technically and restrictively, but flexibly to effectuate its remedial purposes." *S.E.C. v. Capital Gains Bureau,* supra, 375 U.S. at 195, 84 S.Ct. at 284.

Issues addressing the legal standard of culpability required in an enforcement action need not be considered since the assailed conduct easily satisfied the lenient test applied in *Securities and Exchange Commission v. Coffey,* 6th Cir., 493 F.2d 1304, 1314 (1974):

> "(A) potential finding under Rule 10b–5(2) is that he omitted material facts necessary to make the statements . . . not misleading. If the SEC can prove that the alleged omissions represent facts which were known or should have been known by Coffey . . ., that they were necessary to make the information . . . not misleading, and that Coffey knew or should have known that the omitted information was sig-

nificant . . ., then Coffey may have violated Rule 10b–5(2). In addition to these factors, however, it is essential that the SEC show that Coffey's inaction was in 'wilful or reckless disregard for the truth.' "

The Coffey opinion noted that a violator may be identified as a primary participant, aider and abettor, or controlling person. Id. at 1315. Although the latter category has only marginal application to the case at bar, the defendants' activity clearly falls within the conduct categorized by the other terms. Primary liability results when the participants possess an affirmative disclosure obligation by reason of a direct involvement in the subject transaction. Such participation need not be the actual sale, but may include activities touching the transaction. Id., note 24. Unlike the corporate officers' responsibility for subordinates rejected in Coffey, the defendants in the case at bar were ultimately involved in transactions commencing with the contact by the Covington mayor and culminating in the consumer bond sale.

 The argument that these defendants played an insignificant role in a process guided by others was not sustained by the evidence. At any rate, little difficulty is encountered predicating liability to these defendants as aiders and abettors:

"(A) person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the aider-abettor knowingly and substantially assisted the violation." Id. at 1316.

The Sixth Circuit found no indication that Coffey was cognizant of any misrepresentations or knowingly assisted in the perpetration of any deception; conversely, the defendants in the case at bar were aware of and knowledgeably assisted in the suppression of unfavorable circumstances attending the nursing home project. While Coffey's activity was not consciously designed to aid a violation, a similar taciturnity herein was intended to convey a particular—and erroneous—impression of the project's financial outlook.

## VIII

 Street's suggestion that he relied on the advise of Carr Bonner, a Washington D. C. law firm, and Jo M. Ferguson, the Covington bond attorney, is unsupported by the evidence and law governing the "advice of counsel" defense. Five days before the prospectus was published, Tarley asked Carr Bonner to review the preliminary draft copy; the firm subsequently advised Street by telephone that time limitations precluded a proper opinion. Indeed, Tarley testified before the SEC that copies of the prospectus were afforded for informational purposes only and that he did not rely on Carr Bonner for advice. Although in a proper case good faith reliance upon advice of counsel may mitigate a defendant's liability, *Williamson v. United States*, 207 U.S. 425, 453, 28 S.Ct. 163, 52 L.Ed. 278 (1908); *Securities and Exchange Com'n v. Manor Nursing Ctrs., Inc.*, 2d Cir., 458 F.2d 1082, 1101–1102 (1972); *Woolfolk v. Brown*, E.D.Va., 358 F.Supp. 524, 534 (1973), the doctrine is not properly invoked where no reliance is placed on legal advice. *United States v. Custer Channel Wing Corporation*, D.Md., 247 F.Supp. 481, 502–503 (1965), aff'd 5th Cir., 376 F.2d 675 (1967). The asserted dependence upon an opinion rendered by Covington bond counsel is similarly misplaced in view of Ferguson's SEC testimony that he was not advised of the adverse feasibility report or the relationship of Mentor, Stemac, and Senex. "Fundamental requirements for any claim of reliance on counsel's opinion is that all relevant information is disclosed and that the opinion was followed." *United States v. Hill*, D.Conn., 298 F.Supp. 1221, 1235 (1969).

**508**

IX

■ Section 20(b) of the Securities Act of 1933, 15 U.S.C. 77t(b), and Section 21(e) of the Securities Exchange Act of 1934, 15 U.S.C. 78u(e), authorize the commencement of actions to enjoin practices constituting a violation of the legislation. The "proper showing" required of the SEC consists of a demonstration that a violation of the securities laws has occurred, that irreparable public injury is threatened, *Securities and Exchange Com. v. F. S. Johns & Co.*, D. N.J., 207 F.Supp. 566, 573 (1962); but see *Securities & Exch. Com. v. Broadwall Securities, Inc.*, S.D.N.Y., 240 F. Supp. 962, 967 (1965), and that there exists a "reasonable likelihood" of further violations. *Securities and Exchange Commission v. Shapiro*, 2d Cir., 494 F.2d 1301, 1308 (1974); *Securities & Exchange Com'n v. Manor Nursing Ctrs., Inc.*, supra at 1100–1101; *Securities and Exchange Com'n v. Keller Industries, Inc.*, S.D.N.Y., 342 F.Supp. 654, 660 (1972). The hearing testimony indicates that several securities violations have occurred and that the public interest will be thwarted unless appropriate relief is granted.

■ While the completion of bond sales might suggest the improbability of future misconduct, the third criterion for injunctive relief is satisfied by the defendants' admitted intention to continue functioning in the securities area. A *prima facie* showing that the defendants have or will engage in proscribed conduct may be rebutted only by sustaining the burden of proving that there is no reasonable likelihood of continuing illegality. *United States v. W. T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). Further, the defendants' cessation of illegal action is no bar to equitable relief, *United States v. Parke, Davis & Co.*, 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961); *Otis & Co. v. Securities and Exchange Commission*, 6th Cir., 106 F.2d 579, 583–584 (1939), since past violations may create an inference of future misconduct. *Se-*

*curities and Exchange Commission v. Koenig*, 2d Cir., 469 F.2d 198, 202 (1972); *Securities and Exchange Com'n v. Keller Corporation*, 7th Cir., 323 F.2d 397, 402 (1963); *Otis & Co. v. Securities and Exchange Commission*, supra.

The relief sought by the plaintiff will be granted.