E. H. I. OF FLORIDA, INC. d/b/a
Horizon Hospital

v.

INSURANCE COMPANY OF NORTH
AMERICA, Hospital Affiliates International a wholly–owned subsidiary of Insurance Company of North America, H.
A. I. of Florida, Inc., a wholly–owned
subsidiary of Hospital Affiliates International, Richard Shapack, Esquire, individually and as Trustee for Serial
Gross Revenue Sinking Fund Bonds, Series I and II of Horizon Hospital, Inc.,
John Foltz, Esquire, individually and as
Trustee for Serial Gross Revenue Sinking Fund Bonds, Series I and II of Horizon Hospital, Inc., C. Edward Dobbs,
Esquire, and the firm of Kutak, Rock &
Huie.

Civ. A. No. 80–3770.

United States District Court,
E. D. Pennsylvania.

Oct. 20, 1980.

**1054**

Paul R. Rosen, Russell D. Henkin, Philadelphia, Pa., for plaintiff.

Raymond W. Midgett, Jr., John F. Stoviak, Philadelphia, Pa., for defendants.

### SUR MOTION FOR PRELIMINARY INJUNCTION

LUONGO, District Judge.

This case is before me on plaintiff's motion for a preliminary injunction. Plaintiff, E.H.I. of Florida, Inc. (E.H.I.) alleges that the defendants committed violations of § 14(a) of the Exchange Act of 1934, 15 U.S.C.A. § 78n(a) (West 1971), §§ 14(d) and 14(e) of the Williams Amendments to the Exchange Act, 15 U.S.C.A. §§ 78n(d) and (e) (West 1971) (Williams Act), and alleges as well various pendent state claims. The alleged securities violations stem from a letter sent by defendants, Shapack and Foltz, seeking bondholder approval for an agreement entered into by them with defendant H.A.I. of Florida, Inc. for the sale of the real and personal assets of Horizon Hospital, Inc. which were subject to a mortgage and lien held by the bondholders.

On September 29, 1980, Judge Ditter, as Emergency Judge, entered an *ex parte* temporary restraining order enjoining defendants "from taking any further action on the tender offer to the bondholders and any action contemplated by the solicitation materials or recommended therein, including any consideration of the responses received from the bondholders based on the solicitation materials." (Document No. 3, at 2). The temporary restraining order was scheduled to expire on October 9, 1980 (*see* F.R. Civ.P. 65(b)), however, after a hearing on the motion for preliminary injunction, I granted plaintiff's motion to extend it until 10:00 a. m. October 20, 1980, by which time I expected that I would rule on the motion for preliminary injunction.

Upon pleadings and proof adduced at the hearing on the motion for preliminary injunction, I make the following Findings of Fact and Conclusion of Law. F.R.Civ.P. 52.

### I. FINDINGS OF FACT

1. Plaintiff, E.H.I. of Florida, Inc., is a Florida corporation and is currently operating Horizon Hospital, a psychiatric hospital located in Clearwater, Florida.

2. Defendants are Insurance Company of North America (I.N.A.), Hospital Affiliates International, Inc., a subsidiary of I.N.A, H.A.I. of Florida, Inc. (H.A.I.), a Florida corporation which is a subsidiary of Hospital Affiliates International, Inc., Richard Shapack, Esquire, and John Foltz, Esquire, who was trustees for bondholders of bonds issued by Horizon Hospital, Inc. Also named as defendants are the law firm of Kutak, Rock and Huie and one of its partners, C. Edward Dobbs, who represents the bondholder trustees. (Dobbs, at 2.137).

3. Horizon Hospital, Inc. was organized as a non-profit corporation under Florida law on December 6, 1971. (Articles of In-

corporation, Defendants' Exhibit 4). It is the holder of an exemption from federal income tax as a charitable organization which was issued December 29, 1972. (Affidavit of John R. Foltz and Richard A. Shapack, Document No. 6 at Exhibit D.)

Horizon Hospital, Inc.'s Articles of Incorporation provide, *inter alia*, that its purposes shall be "exclusively ... scientific, educational and charitable" and "not for pecuniary profit" (Articles of Incorporation, Defendants' Exhibit 4, Art. II); that all of the assets and earnings of the corporation shall be used exclusively for these purposes and that "no part of the net earnings shall inure to the benefit of any individual" (*id.*); that it "shall have no capital stock, pay no dividends, distribute no part of the income to its members, directors or officers" (*id.*, Art. XII); and that upon dissolution all of its property shall be dedicated to the purposes for which it was created and "[u]nder no circumstances shall any of the assets ..., upon dissolution, be distributed to the members hereof." *Id.*, Art. XII.

4. Horizon Hospital, Inc. undertook to construct a hospital facility (the Hospital) at Clearwater, Florida. The Hospital was financed through Horizon Hospital, Inc.'s issuance of sinking fund bonds. These bonds, issued under a trust indenture dated February 1, 1973, are denominated Horizon Hospital, Inc., Serial Gross Revenue Sinking Fund Bonds, Series I and II (bonds). The bonds bear interest at the rate of 9% and 9½% per annum and are secured by a first mortgage lien on real property and a first lien on the gross revenue of the Hospital (Trust Indenture and Bond, Plaintiff's Exhibits 2 and 7).

5. The bonds are not traded on any national securities exchange (Foltz 2.8).

6. Plaintiff E.H.I. does not claim to hold any of the bonds.

7. On February 1, 1976, Horizon Hospital, Inc. failed to make a quarterly interest payment to the bondholders and the bonds went into default. (Notice for Vote by Bondholders, September 10, 1980, Defendants' Exhibit 7 at 8). No interest payments have been made on the bonds since June 1, 1979, and as of August 1, 1980, fourteen quarterly interest payments, or approximately $4,300,000, are in arrears. Further, no sinking fund payments have been made, although they were scheduled to commence in 1976. (*Id.* at 8; Foltz 2.88.)

8. Some of the individuals involved in the original construction and financing of the Hospital were convicted of crimes stemming from their involvement. (Notice for Vote by Bondholders, September 16, 1980, Defendants' Exhibit 7, at 4.)

9. In March of 1980, plaintiff and the Board of Trustees of Horizon Hospital, Inc. entered into a Lease dated March 29, 1980, which incorporated a letter agreement dated March 18, 1980, with an addendum dated March 19, 1980. (*See* Lease, Plaintiff's Exhibit 4.) The parties also entered into an option agreement giving E.H.I. the right to purchase the assets of the Hospital. (Option to Purchase, Plaintiff's Exhibit 5.)

10. Under the terms of the Lease, E.H.I. undertook to lease and manage all of the assets, tangible and intangible, of the Hospital for a term of ten years, terminating March 1, 1990, at an annual rental of $1,440,000 payable quarterly. In addition, E.H.I. was given an option to renew the lease for two additional five–year terms. (Lease, Plaintiff's Exhibit 4, Art. 2.01). E.H.I. was obligated to pay an additional $360,000 annually, payments to be made commencing September 1, 1981, and ending September 1, 1984, and, together with the above, a sum sufficient to allow redemption of the bonds at face value plus interest. (*Id.*, Art. 3.) The letter agreement and addendum which were incorporated into the lease, provided for an initial $500,000 payment, plus what the parties have labelled a balloon payment at the end of the fifth year of the lease. This balloon payment was intended to make sure that the bonds would no longer be in default at the end of the fifth year of the E.H.I. lease. (Foltz at 2.70; Report to the Bondholders, June 5, 1980, Plaintiff's Exhibit 11.)

11. The option agreement gives E.H.I. the option to purchase the assets of the

hospital at any time during the initial term of the lease for $14,454,797, reduced by any rental payments made under the lease, and further provides for all rental payments to be made to the Bondholder Trustees to be applied to the principal and interest outstanding on the bonds. (Option to Purchase, Plaintiff's Exhibit 5, ¶ 3(a); Report to the Bondholders, June 5, 1980, Plaintiff's Exhibit 11 at 3.) The lease and option agreements do not make E.H.I. the successor or assign of Horizon Hospital, Inc. as that term is defined in the indenture.

12. The E.H.I. lease and option agreement were thus intended to satisfy the outstanding obligation on the bonds. (Report to the Bondholders, June 5, 1980, Plaintiff's Exhibit 11 at 3.)

13. E.H.I. was entitled to keep any surplus after rental payments and thus intended to make a profit from its operations.

14. The written approval of the bondholder trustees is a condition precedent to the obligation to pay rent under the lease. (Lease, Plaintiff's Exhibit 5 at Art. 3.02.) It is a matter of dispute whether that approval was ever given. Additionally, no payments have been made by E.H.I. although it is a matter of dispute as to whether E.H.I. has tendered such payments. (Dobbs, 2.141–2.143; Foltz, 2.73–2.77.)

15. On May 23, 1980, Horizon Hospital, Inc. filed a petition for bankruptcy under Chapter VII of the Bankruptcy Code, 11 U.S.C.A. §§ 701–728 (West Supp.1979). Pursuant to the Bankruptcy Code, all proceedings against Horizon Hospital, Inc. or its property have been stayed. Id. § 362. (Notice of Meeting of Creditors and Automatic Stay, Defendants' Exhibit 6.) Subsequently, on May 30, 1980, the bondholder trustees, at the behest of their counsel Dobbs, converted the proceeding to one for reorganization under Chapter XI of the Code, 11 U.S.C.A. §§ 1102–1174 (West Supp. 1979) (Dobbs, 2.137–140).

16. There are three matters before the bankruptcy court involving E.H.I. Horizon Hospital, Inc. has sued E.H.I. to recover $150,000 transferred by it to E.H.I. at the start of the lease term to pay then–existing creditors. E.H.I. has applied to the bankruptcy court for funds to meet E.H.I.'s payroll. E.H.I. also claims the assets of two bank accounts that were frozen by the bankruptcy court. In a pleading filed in that action, E.H.I. claims that it owns the Hospital outright. (Dobbs, 3.24–26, 3.27.)

17. The Hospital is presently being operated without a license as state officials will not grant a license until the bankruptcy proceedings are completed. (Dobbs, 2.161.)

18. On August 19, 1980, the bondholder trustees, represented by Kutak, Rock & Huie, and Dobbs, entered into an Asset Purchase Agreement with H.A.I. whose obligations under the agreement were guaranteed by its parent, Hospital Affiliates International, Inc. (Asset Purchase Agreement, Defendants' Exhibit 2.) This agreement was amended on August 19, 1980 (Defendants Exhibit 3.)

19. The asset purchase agreement provided for, among other things, the sale to H.A.I. of all of the tangible real and personal property of Horizon Hospital, Inc. which are pledged as security for the bonds. The agreement, however, specifically excludes from the sale any rights in action which Horizon Hospital, Inc. or the bondholder trustees may have against third parties arising out of the issuance and sale of the bonds or construction or management of the hospital facilities. (Id. § 1.01.) The terms of the agreement provide that the sale will take place only if the bondholder trustees obtain title to the assets essentially free of all liens and encumbrances. (Id. § 3.02.) The sale was also conditioned upon, among other things, the approval of the transaction by the persons holding a majority in principal amount of the bonds. (Id. § 3.01.)

20. The purchase price under the agreement is $9,450,000, subject to escalation at a rate of 8% per annum from the date that written approval of the bondholders is obtained until the date of completion of the sale. (Id. § 1.04.) The agreement also provides, however, that the bondholder trus-

tees are required to hold 10% of the purchase price in escrow in order to satisfy any claims the buyer may have against it. The money is to be so held at least twelve months or until any claim made by H.A.I. is finally adjudicated. (*Id.* § 14.04.) Further, the buyers do not assume any liability for claims against the Hospital by third parties accruing prior to closing. (*Id.* § 1.07.) The bondholder trustees are also obligated to use their best efforts to obtain bondholder approval.

21. The provision in the agreement calling for bondholder approval was included at the request of the trustees. (Foltz, 2.122.) Neither the indenture nor the bonds themselves give the bondholders the right to vote on such matters. However, their approval was solicited because the bondholder trustees and their counsel felt that it was important to have bondholder approval on such a matter. (Foltz, 2.122; Dobbs, 2.155.)

22. Plaintiff had no knowledge of the agreement until just prior to the initiation of this lawsuit.

23. Pursuant to the agreement, on or about September 10, 1980, the bondholder trustees sent a letter entitled, "Notice for Vote by Bondholders" to which was attached a "Ballot Statement" (Defendants' Exhibit 7). In the letter the trustees recommended that the bondholders approve the transaction. The letter does not ask the bondholders to tender their bonds nor does it state that the H.A.I. transaction would satisfy their outstanding claims against Horizon Hospital, Inc.

24. While the letter states that the bondholder trustees did not presently intend to bring any claims that the bondholders might have against third parties involved in the construction of the Hospital, trustee Foltz testified that they intend to pursue such claims and such claims are presently being litigated. Additionally, Foltz stated that the trustees might have an action against E.H.I. (Foltz, 2.20, 2.23–27; Dobbs, 2.148–149.)

25. The bondholders approved the H.A.I. transaction. H.A.I. was notified of the approval prior to the issuance of the tempo-rary restraining order. It is not clear whether the notification was oral or in writing. (Foltz, 2.107–08.)

26. In its complaint, plaintiff contends that the letter to bondholders contains material omissions and is misleading.

27. The letter does not inform the bondholders of the trustees' obligation under the H.A.I. asset–purchase agreement to use their best efforts to seek the bondholders' approval.

28. In explaining to the bondholders what the ratio of return would be on their investment, the bondholder trustees stated in the letter that it would be 86.6%. This figure is based on the ratio between the stated purchase price and the outstanding principal due on the bonds. The letter does not indicate what the ratio of return would be in relation to principal and accrued interest. This figure has been calculated at 62.1%. (Hempstead, 1.35–36.)

29. The letter does not inform the bondholders what would occur if the bondholders did not approve the transaction.

30. The letter does not inform the bondholders of the existence of the balloon payment required to be made under the lease by E.H.I. The bondholder trustees did state in the letter that they did not give their approval to the E.H.I. transaction.

31. The letter does not disclose to the bondholders the difference between the total amount which would be paid under the E.H.I. lease and the amount which would be realized under the H.A.I. agreement. Further the letter does not make a comparison of the present cash value of the E.H.I. and H.A.I. transactions. There is testimony that the present cash value of the E.H.I. transaction is $4,500,000 more than the maximum recovery possible to the bondholders under the H.A.I. agreement. (Hempstead, 1.46.)

32. The letter does not contain a financial statement of the Hospital. E.H.I. has not provided the bondholder trustees with such a statement. E.H.I. has offered to allow the bondholder trustees to examine

the books, but only if the trustees promised not to reveal the substance of what they had reviewed. (Dobbs, 2.160.)

33. The bondholders were not told in the letter that if the underlying assets were sold at a public sale by order of the Bankruptcy Court, the bondholder trustees were obligated, by the H.A.I. agreement, to bid up to the full amount of the interest and principal due on the bonds (approximately $15,000,000) even though they would still be obligated to deliver title to the assets of the Hospital to H.A.I.

34. The bondholders were not informed that under § 3.03 of the asset–purchase agreement, the trustees must use their best efforts to attempt to secure a court order appointing H.A.I. as the Hospital's receiver pending the foreclosure proceedings. Under this provision, H.A.I. would keep all profits generated during its tenure as receiver.

35. The letter does not inform the bondholders that the trustees are required by the asset–purchase agreement to object to any other plan submitted to the bankruptcy court, whether or not it is more beneficial than the H.A.I. arrangement.

36. The letter did not include a copy of either the E.H.I. lease and option to purchase or the H.A.I. asset–purchase agreement. The letter did state that the bondholders could receive a copy of the asset–purchase agreement for $5.00. (Notice for Vote by Bondholders, Defendants' Exhibit 1 at 12.)

## II. DISCUSSION

### A. Standards for Preliminary Injunction

To be entitled to a preliminary injunction plaintiff has the burden of showing that (1) irreparable injury will be caused if relief is not granted to maintain the status quo, and (2) it has a reasonable probability of eventual success on the merits. *Continental Group, Inc. v. Amoco Container Company*, 614 F.2d 351, 356 (3d Cir. 1980). Additionally, the court must weigh the possibility of harm to the non–moving party, and where relevant, the possibility of harm to the public. *Id.*

### 1. *Irreparable Harm*

■ Although there was some authority to the contrary at one time, it is now clear that in Williams Act and § 14(a) cases, irreparable harm is a prerequisite to injunctive relief. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975); *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 96 (2d Cir. 1977); *Klaus v. Hi–Shear Corporation*, 528 F.2d 225, 232 (9th Cir. 1975); *Stromfeld v. Great Atlantic & Pacific Tea Co., Inc.*, 484 F.Supp. 1264, 1273 (S.D.N.Y.1980); *Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468, 479 (E.D.Pa.1978); *S–G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114, 1126 (D.Mass.1978).

For an injunction to issue the threatened harm must be to those intended to be protected by § 14(a) of the Exchange Act and §§ 14(d)–(e) of the Williams Act. *See, e. g., Klaus v. Hi–Shear Corporation, supra*, at 232; *S–G Securities v. Fuqua, supra*, at 1129.

In *Klaus v. Hi–Shear Corporation, supra*, at 232, the court stated that "[i]n enacting section 14(a), Congress intended to guaranty the integrity of the processes of corporate democracy."

The bondholders here are not entitled to a voice in the management of the Hospital under the trust indenture. They were asked to vote on the H.A.I. transaction only because the bondholder–trustees wanted their approval on a matter so significantly affecting the security for their bonds. Thus, the principle of corporate democracy, which § 14(a) was intended to protect (see *J. I. Case Co. v. Borak*, 377 U.S. 426, 431–32, 84 S.Ct. 1555, 1559–1560, 12 L.Ed.2d 423 (1964)) is not implicated in this case.

■ Indeed, plaintiff has essentially contended throughout this case that the harm which is threatened here is not that the bondholders have been disenfranchised, but rather that the bondholders will lose the benefits of the E.H.I. lease. This is not the type of harm against which § 14(a) is intended to protect. *See Klaus v. Hi–Shear*

*Corporation, supra,* at 232. Nor, as will be discussed *infra,* is this type of harm irreparable. Thus, plaintiff has not met its burden of showing irreparable harm from a violation of section 14(a).

■ I am also not convinced that plaintiff has met its burden of showing irreparable harm under either one of its Williams Act claims. "The sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer." *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). The act is not designed to assist the incumbent management of a target corporation to resist takeover attempts, but rather it is intended to insure that securities holders have adequate information concerning "the qualifications and intentions of the offering party." *Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 58, 95 S.Ct. at 2075. Thus, while the management of a target corporation has been granted standing to seek injunctive relief under the Williams Act, the only purpose of the grant of standing is to allow management, who often is the only party in possession of relevant information, to protect the investor.[1] *See e. g., Electronic Specialty Co. v. International Controls Corporation,* 409 F.2d 937, 947 (2d Cir. 1969); *Weeks Dredging & Contracting v. American Dredging, supra,* at 477. The threatened harm that should be analyzed for the purpose of deciding whether a preliminary injunction should issue under the Williams Act, therefore, is the harm threatened to securities holders and public

investors. *S–G Securities, Inc. v. Fuqua Inv. Co., supra,* 466 F.Supp. 1114 at 1129. *Cf. Brascan Limited v. Edper Equities Ltd.,* 477 F.Supp. 773 (S.D.N.Y.1979).

Plaintiff contends that the harm threatened to the bondholders is that they will lose the benefit of the E.H.I. transaction. This is the type of harm which can be redressed by an action for damages by the bondholders themselves. *See General Aircraft Corp. v. Lampert,* 556 F.2d 90, 97 (2d Cir. 1977); *Klaus v. Hi–Shear Corporation, supra,* at 232; *Stromfeld v. Great Atlantic & Pacific Tea Co., Inc.,* 484 F.Supp. 1264, 1273 (S.D.N.Y.1980). While the *Lampert* case involved a violation of § 13(d) of the Williams Act (15 U.S.C.A. § 78m(d) (West 1971))[2] what the court stated in that case is persuasive in the situation in the case at bar. The Second Circuit stated that investors "who bought or sold . . . at an unfair price or in reliance upon the inaccurate Schedule 13D have an adequate remedy at law by way of an action for damages, thereby negating their entitlement to equitable relief." *General Aircraft Corp. v. Lampert, supra,* at 97, *citing, Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49 at 59–60, 95 S.Ct. 2069 at 2076–2077, 45 L.Ed.2d 12.

Accordingly, assuming arguendo that defendants have violated the Williams Act, the only harm which plaintiff alleges that the bondholders will suffer can be redressed through an action for damages and injunctive relief is, therefore, inappropriate under § 14(d) and § 14(e), as well as under § 14(a).

---

1. In their brief in opposition to the preliminary injunction, defendants contend that E.H.I. lacks standing to seek injunctive relief. The terms of the E.H.I. lease clearly indicate that E.H.I. was to manage and totally control the operations of the Hospital. *See* Lease, plaintiff's Exhibit 4 at 1. Accordingly, the purpose of granting management standing to seek injunctive relief under the Williams Act is served by allowing E.H.I. rather than Horizon Hospital, Inc.'s Board of Trustees, to bring suit since E.H.I. was performing the functions of management, at least insofar as the Hospital was concerned.

2. Section 13(d) of the Williams Act requires the same disclosures as § 14(d) of the Act except that the disclosures must be made within ten

days after a party has purchased more than 5% of a class of registered equity securities. 15 U.S.C.A. § 78m(d)(1) (West 1971). The *Rondeau* requirement of irreparable harm is applicable to all of the Williams Act, not just § 13(d). *See Klaus v. Hi–Shear Corporation, supra,* at 231. Thus, the traditional equitable principle that there must be no adequate remedy at law for an injunction to issue applies in a §§ 14(e) and 14(d) case, as well as a § 13(d) case. *See Rondeau v. Mosinee Paper Corp., supra,* 422 U.S. at 65, 95 S.Ct. at 2079. *See generally* Note, Tender Offer Regulation–Injunction Standards Under the Williams Act, 45 Ford.L.Rev. 51 (1976).

*Rondeau v. Mosinee Paper Corp., supra,* at 60, 95 S.Ct. at 2076.[3]

## 2. *Reasonable Probability of Success on the Merits*

As a further ground for denial of preliminary injunctive relief, plaintiff has not satisfied me that it has a reasonable probability of success on the merits of its federal securities law claims.

### *The 14(a) and 14(d) Claims*

■ Section 14(a) of the Exchange Act of 1934 and § 14(d) of the Williams Act, 15 U.S.C.A. § 78n(a) & n(d) (West 1971) are designed to regulate different types of transactions. Section 14(a) makes it unlawful for any person to solicit proxies or consents in contravention of the regulations promulgated by the SEC.[4] Section 14(d) makes it unlawful for a person to make a

tender offer for certain equity securities without filing a statement disclosing specified information to the Commission.[5] Although differing in their regulatory purposes, both of these sections explicitly state that they are applicable only when the security with which the transaction is concerned is a security registered pursuant to § 12 of the Act. 15 U.S.C.A. § 78*l*(g).

It is undisputed that the Horizon Hospital, Inc. bonds are not traded or listed on any national stock exchange. Accordingly, the registration requirements of § 12(g), 15 U.S.C.A. § 78*l*(g), which concerns unlisted securities are applicable. Section 12(g)(*1*), however, requires only equity securities to be registered. Therefore, unless the Horizon Hospital, Inc. bonds are equity securities, the provisions of neither § 14(a) nor § 14(d) are applicable to the transaction in

---

**3.** Even if the Williams Act were concerned with the harm suffered by the target management, plaintiff has not satisfied me that the harm that *it* will suffer is irreparable. The crux of E.H.I.'s position is that it has a valid contract to manage -lease, and an option to purchase, the Hospital. In addition to the rights which E.H.I. is presently pursuing in the bankruptcy proceedings, it has various common–law damage actions which it can bring to redress any harm which it may suffer. Indeed, it has pled such claims as part of its complaint. *See* Complaint, counts II–V. Plaintiff has not argued that an injunction should issue on the basis of those claims. Its assertion that it is entitled to injunctive relief has been predicated entirely on the purported violations of the federal securities laws.

**4.** Section 14(a) provides:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempt security) registered pursuant to section 78*l* of this title." 15 U.S.C.A. § 78n(a) (West 1971).

**5.** Section 14(d) provides:

"(d)(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender

offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title ... if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribed. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders." 15 U.S.C.A. § 78n(d) (West 1971).

this case. *See Henry Heide, Incorporated* [1972–73 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 78,838 (1972).

The Exchange Act defines an equity security as

any stock or similar security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any other security which the Commission shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations as it may prescribe in the public interest or for the protection of investors, to treat as an equity security.

15 U.S.C.A. § 78c(a)(11) (West 1971).

Under the authority of this section the Commission has further defined the term equity security as including:

any stock or similar security, certificate of interest or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, limited partnership interest, interest in a joint venture, or certificate of interest in a business trust; or any security convertible, with or without consideration into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any put, call, straddle, or other option or privilege of buying such a security or selling such a security to another without being bound to do so.

17 C.F.R. § 240.3all–1 (1979).

The Horizon Hospital, Inc. bonds are not convertible into any of the securities mentioned in the definition. Further, plaintiff does not contend, and there is nothing in the record to indicate, that the bondholders have any right to share in any possible profits of Horizon Hospital, Inc. Thus, the bonds do not appear to fit within the SEC definition. *See Henry Heide, Incorporated, supra* (debentures are not equity securities).

Plaintiff, however, contends that these bonds are similar to stock and thus come within the SEC definition. On the basis of the record before me, I disagree. "Stock is an equity; it represents an ownership interest. It is to be distinguished from obligations such as notes or bonds which are not equities and represent no ownership interest." *United States v. Evans,* 375 F.2d 730, 731 (9th Cir. 1967). The ownership interest represented by stock gives the holder "the right to participate in the management of the corporation" and to share in the surplus profits of the corporation on dissolution. Whereas, "the distinguishing feature of bonds is the obligation to pay a fixed sum of money with stated interest." 6A Fletcher Cyclopedia Corporations, § 2635 at 5 (1968 & Supp.).

Plaintiff has offered no evidence that the Horizon Hospital, Inc. bonds signify anything more than an obligation "to pay a fixed sum of money with stated interest." The fact that the bonds are secured by a mortgage and lien on the assets of the Hospital does not change the essential nature of the instrument. Plaintiff does not contend that the bondholders would be entitled to recover anything in excess of their collective debt in the event foreclosure would result in an amount greater than that owed. Any surplus remaining from the sale of the assets pledged as security for the bond debt would be the property of the non–profit corporation, Horizon Hospital, Inc.

Pursuant to its articles of incorporation, there are no stockholders in Horizon Hospital, Inc. As stated, however, one of the characteristics of stock is the right to manage the corporation. Plaintiff contends that the fact that the bondholders voted on matters of bondholder concern gave them the management power normally held by stockholders and thus made the bonds similar to stock.

Even if the bondholders did participate in management, that alone would not be enough to classify these bonds as equity securities. In *United States v. Evans,* 375 F.2d 730, 731 (9th Cir. 1967), the court, in a tax case, held that where all the characteristics of debt are present the fact that the

holder participates in management does not make the instrument stock. *Id.*

In any event, I am not persuaded that the Horizon Hospital, Inc. bondholders participate in the management of the corporation. As stated previously, the bondholders were called upon to vote only because the bondholder trustees desired their approval on a transaction relating to the security for their debt. There was testimony to the effect that the only reason that there was a 50% approval provision in the H.A.I. asset–purchase agreement was because the trustees requested it. There is nothing in the record to indicate that the bondholders voted on anything other than matters which concerned their interests. Due to the financial straits of the Hospital and the fact that the mortgage could be foreclosed at any time, the bondholders may have had leverage akin to shareholder control, but unlike shareholder control, that leverage could have been bought off at any point by payment of the outstanding amount due on the bonds. Thus, I am not satisfied, on the showing thus far made, that plaintiff will be able to establish that the Horizon Hospital, Inc. bonds have the characteristics of stock which should be regarded as equity securities.

Even if E.H.I. should succeed in establishing that the Horizon Hospital, Inc. bonds are equity securities, it would still face the formidable task of proving that the bonds should have been registered pursuant to § 12(g)(*1*), thereby becoming subject to §§ 14(d) and (e).

Section 12(g)(2)(D) exempts from its registration requirement "any security of an issuer organized and operated exclusively for religious, educational, benevolent, fraternal, charitable, or reformatory purposes and not for pecuniary profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." 15 U.S.C.A. § 78*l*(g)(2)(D) (West 1971).

Plaintiff claims that this exemption should not apply to Horizon Hospital, Inc. bonds because the Hospital ceased to be a non–profit entity when E.H.I. took over its management pursuant to the lease–purchase agreement. It further contends that once the Hospital changed its status by bringing in outside management, the bonds should have been registered. *See Securities and Exchange Commission v. Children's Hospital*, 214 F.Supp. 883 (D.Ariz.1963).

In support of this contention plaintiff relies solely on *Children's Hospital, supra.* That case was an enforcement action brought by the SEC seeking to enjoin the sale of bonds which had not been registered with the Commission as required by the Securities Act of 1933. The 1933 Act contains a charitable organization exemption which is virtually identical to the one found in the 1934 Act. *Compare* 15 U.S.C.A. § 77q(a) (West 1971) *with* 15 U.S.C.A. § 78*l* (g)(2)(D) (West 1971). The *Children's Hospital* court held that the exemption was not applicable to the bonds because a "substantial purpose of the organization of the hospital is to enrich the promoters from the hospital." *Securities and Exchange Commission v. Children's Hospital, supra*, 214 F.Supp. at 889. This anticipated profit by the promoters was the non–charitable element which defeated the exemption. *Id.* at 891.

While the court in *Children's Hospital* did state that once the purpose of a corporation changed from non–profit to profit it is required to register its securities, the court clearly did not decide the issue as to whether a non–profit corporation loses its status when it brings in a profit oriented management company to operate a facility owned by the non–profit corporation. Plaintiff throughout these proceedings has failed to acknowledge the distinction between Horizon Hospital, Inc., the non–profit charitable corporation, and the Hospital, the facility owned by the non–profit corporation and for the construction of which the non–profit corporation issued these bonds. The fact that the facility owned by the non–profit corporation is operated for a profit does not alter the character of the non–profit corporation so long as the corporation continues to adhere to its articles in incorporation.

Accordingly, on this record, E.H.I. has failed to show a reasonable probability of success in establishing that this transaction is subject to the requirements of § 14(a) and § 14(d). Indeed, § 14(d) may not apply regardless of whether or not the bonds should have been registered, since, as I will discuss *infra* under the § 14(e) claim, it is doubtful that the H.A.I. transaction was a tender offer to which § 14(d), by its terms, applies.

### The § 14(e) Claim

■ Section 14(e) is the general anti–fraud provision of the Williams Act.[6] Unlike sections 14(a) and (d), it applies to all securities regardless of whether or not they are equity securities and whether or not they are required to be registered. *Henry Heide, supra.* Section 14(e), however, is applicable only when the untrue statement of a material fact or an omission of a material fact is made "in connection with any tender offer or request or invitation for tenders or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C.A. § 78n(e) (West 1971). Thus, even if the letter to the bondholders did contain misstatements and omissions of material facts, § 14(e) will apply only if the letter constituted a tender offer. Similarly, the provisions of § 14(d) are applicable only if there has been a tender offer. *Id.* § 78n(d).

Neither the Williams Act itself, nor the regulations promulgated thereunder, supply a definition of the term tender offer. The Commission has stated that its failure in the past to define what is a tender offer was due to "the dynamic nature of these transactions and the need for the Williams Act to be interpreted flexibly in a manner consistent with its purposes to protect investors." Proposed Rule 14d–1(b)(1): Definition of the Term "Tender Offer", 44 Fed. Reg. 70349 (Discussion of the Commission).

The "typical" tender offer has been described as

a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

H.R.Rep. No. 1711, 90th Congress, 2d Sess. reprinted in [1968] U.S.Code Cong. & Admin.News, p. 2811.

The courts, however, have recognized that the purpose of the Williams Act, the protection of the investing public, would best be served by not limiting the meaning of tender offers to transactions such as the cash tender offer defined in the House Report. *See, e. g., Smallwood v. Pearl Brewing Company*, 489 F.2d 579, 596–99 (5th Cir. 1974); *Cattlemen's Investment Co. v. Fears*, 343 F.Supp. 1248 (W.D.Okl.1972), *vacated per stipulation*, No. 72–152 (W.D.Okl. May 8, 1972); *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y.1979); *S–G Securities, Inc. v. Fugua Inv. Co.*, 466 F.Supp. 1114 (D.Mass. 1978); *Gilbert v. Bagley*, 492 F.Supp. 714 [Current] Fed.Sec.Rep. (C.C.H.) ¶ 97,553 (D.C.N.C.1979).

Accordingly, the threshold determination I must make is whether the record before me indicates that the letter to bondholders and the H.A.I. asset–purchase agreement was a tender offer.

An analysis of the pertinent cases indicates that while the courts have been liberal in extending the remedial protections of § 14(e) to methods of acquisition which

---

6. Section 14(e) provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purpose of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

15 U.S.C.A. § 78n(e) (West 1971).

varied from the "typical tender offer," each of those cases involved the purchase of securities. *See, e. g., Smallwood v. Pearl Brewing Company, supra,* 489 F.2d at 598 (repurchase of shares pursuant to a sellout provision of a merger agreement unopposed by management held to be a tender offer); *Wellman v. Dickinson, supra,* 475 F.Supp. at 826 (acquisition of shares held to be a tender offer despite fact that offeror did not publicize the offer); *S–G Securities, Inc. v. Fuqua Inv. Co., supra,* 466 F.Supp. at 1126 (privately negotiated and open market purchases of shares which were preceded by publicity held to be a tender offer); *Cattlemen's Investment Co. v. Fears, supra,* 343 F.Supp. at 1252 (individual solicitation of shareholders for purchase of shares held to be a tender offer).

Even in those cases holding that there was not a tender offer, the transaction involved concerned an offer or solicitation for the sale of securities. *See, e. g., Brascan Limited v. Edper Equities Ltd.,* 477 F.Supp. 773, 789 (open market purchase of securities not a tender offer); *Gilbert v. Bagley, supra.* [Current] Fed.Sec.L.Rep. (C.C.H.) ¶ 97,553 (purchase of the securities pursuant to a court settlement not a tender offer).

While the SEC has not yet enacted a regulation defining a tender offer, a proposal defining the term is currently pending. This proposal states:

The term "tender offer" includes a "request or invitation for tenders" and *means one or more offers to purchase or solicitations of offers to sell securities of a single class,* whether or not all or any portion of the securities sought are purchased which

(i) during any 45–day period are directed to more than 10 persons and seek the acquisition of more than 5% of the class of securities, except that offers by a broker (and its customer) or by a dealer made on a national securities exchange at the then current market or made in the over–the–counter market at the then current market shall be excluded if in connection with such offers neither the person making the offers nor such broker or dealer solicits or arranges for the solicitation of any order to sell such securities and such broker or dealer performs only the customary functions of a broker or dealer and receives no more than the broker's usual and customary commission or the dealer's usual and customary mark–up; or

(ii) are not otherwise a tender offer under paragraph (b)(1)(i) of this section, but which (A) are disseminated in a widespread manner, (B) provide for a price which represents a premium of the greater of 5% of or $2 above the current market price and (C) do not provide for a meaningful opportunity to negotiate the price and terms.

Proposed Rule 14d–1(b)(1): Definitions of the Term "Tender Offer", 44 Fed.Reg. 70349, 70358 (1979) (emphasis supplied).

Thus, the proposed rule comports with the case law on this subject, in that there must be "an offer to purchase or solicitation of offers to sell securities" for a transaction to be a tender offer.

There has been some support in dictum for the proposition that a tender offer is "any method of acquisition with the capability of exerting pressure upon shareholders", *Gilbert v. Bagley, supra,* at 714 [Current] Fed.Sec.Rep. (C.C.H.) at 97,909. *See, also* Note, The Developing Meaning of "Tender Offer" Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1275–76 (1973). Neither the courts nor the SEC, however, have ever applied the tender offer rules to a transaction not involving the acquisition of control through the purchase of securities. The *Gilbert* case, despite its broad pronouncement, involved a sale of securities accomplished through a court settlement. Plaintiff itself appears to realize that an offer for the sale of securities is necessary for there to be a tender offer when it states, "the overriding purpose of section 14(e) is to extend protection to securities holders from any kind of fraudulent practices in connection with any solicitations for them to surrender or cancel their securities." Plaintiff's Brief in Sup-

port of Motion for Preliminary Injunction at 8.[7]

Accordingly, before plaintiff can undertake to establish that there were material misstatements or omissions in the letter to bondholders, it must show that the H.A.I. asset–purchase proposal was a solicitation for the purchase of securities. I am not satisfied, on this record, that plaintiff will ultimately be able to prove that this is such a transaction. There is no evidence in the record indicating that the bondholders were to surrender their bonds upon consummation of the H.A.I. deal.

The defendants' labelling of this transaction as an asset–purchase agreement, however, is not the determining factor. Parties cannot avoid the remedial purposes of the Williams Act by merely labelling their transaction as something which falls outside the "periphery of the Act." *See Wellman v. Dickinson, supra,* at 826. *See, also,* Proposed Rule 14d–1(b)(1), *supra,* 44 Fed.Reg. 7034 (discussion of the commission). If, in reality, this transaction was looking toward a sale of the bonds, then plaintiff might have a reasonable probability of success on its § 14(e) claim. But plaintiff has failed to produce sufficient evidence to allow me to find that it has a reasonable probability of proving that the H.A.I. agreement was, in effect, an offer for the sale of securities. While the agreement did involve the sale of the principal assets of the obligor on the

bonds, Horizon Hospital, Inc., there was uncontradicted testimony that there were other assets, primarily choses in action owned by Horizon Hospital, Inc., which were retained by Horizon Hospital, Inc. and which might be applied toward further satisfaction of the bonds. One of the bondholder trustees testified that the trustees intended to or have instituted claims against E.H.I. and the original promoters of the bonds. While recovery on these claims may be speculative, the existence of the claims represents a potential source of return to the bondholders. The bondholders were thus not surrendering, under the H.A.I. asset–purchase agreement, all of their right, to the security underlying their bonds. Accordingly I cannot now find that plaintiff has a reasonable likelihood of establishing that this sale of assets constituted a tender offer for securities such as to trigger the remedial provisions of section 14(e).[8]

In light of my determination that plaintiff has failed to show a reasonable probability of proving that the transaction is subject to the threshold requirements of § 14(e), it is unnecessary for me to determine whether the letter to bondholders was materially misleading.

In conclusion, plaintiff has not met its burden of showing that irreparable harm will be caused by the withholding of preliminary injunctive relief and, further, plain-

---

**7.** It is significant that the SEC specifically excluded sales of securities pursuant to statutory mergers and consolidations, and court orders from its proposed definition. *See* Proposed Rule 14d–1(b)(1): Definition of the Term "Tender Offer", 44 Fed.Reg. 70349, 70352. The commission stated its reason for this exclusion was that it did not believe that these events constitute "an offer to purchase or a solicitation of an offer to sell securities." *Id.* However, the exclusion also indicates that the commission has rejected the position that any acquisition which has the tendency to exert pressure on shareholders is a tender offer.

**8.** The court in *Wellman v. Dickinson* set out numerous factors which are present in a tender offer. *See* 475 F.Supp. at 824–825. These factors have been approved by the SEC in the event that the proposed definition is not adopted. *See* Proposed Rule, *supra,* 44 Fed.Reg. at 70352, n.25. The factors are (1) active and

widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only a limited period of time; (7) offeree subjected to pressure to sell his stock; (8) publicity concerning the transaction. 475 F.Supp. at 824–825. While I agree with plaintiff that the H.A.I. transaction has many of these features, the *Wellman* test still requires an offer for the sale of securities. Thus, the question of whether or not a method of securities acquisition is a tender offer cannot be reached until there has been a determination that there is someone seeking to acquire securities.

tiff has failed to establish that it has a reasonable probability of success on the merits as to any of the federal securities claims it has raised. Accordingly, I have denied its motion for preliminary injunction.

## CONCLUSIONS OF LAW

1. This court has jurisdiction by virtue of 15 U.S.C.A. § 78aa (West 1971).

2. Plaintiff has failed to establish that it or any of the persons whom § 14(a) of the Exchange Act of 1934 (15 U.S.C.A. § 78n(a) (West 1971)) and §§ 14(d) and (e) of the Williams Act (15 U.S.C.A. §§ 78n(d)–(e) (West 1971)) are intended to protect will suffer irreparable harm if injunctive relief is not granted. Each has an adequate remedy at law in an action for damages.

3. Plaintiff has failed to establish on this record that the Horizon Hospital, Inc. bonds were required to be registered and accordingly has failed to show a reasonable probability of success on the merits of its claims brought under § 14(a) of the Exchange Act (15 U.S.C.A. § 78n(a) (West 1971)) and § 14(d) of the Williams Act (15 U.S.C.A. § 78n(d) (West 1971)).

4. Plaintiff has failed to establish on this record that the H.A.I. asset–purchase agreement was anything more than an agreement for the purchase of assets, and therefore has not shown that this transaction is a tender offer for the purchase of securities. Accordingly, plaintiff has not met its burden of showing that it has a reasonable probability of success on the merits of its claim brought under § 14(e) Williams Act (15 U.S.C.A. § 78n(e) (West 1971)).

5. Plaintiff is not entitled to the issuance of a preliminary injunction.